**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JAMES CHELMOWSKI,<br><br>       *Plaintiff*,<br><br>   v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY,<br><br>       *Defendant*. | Civil Action No. 24-1336 (RDM) |

**MEMORANDUM OPINION AND ORDER**

This case concerns the latest—but doubtlessly not the final—stage in Plaintiff James Chelmowski's ever-escalating Freedom of Information Act ("FOIA") dispute with the Environmental Protection Agency ("EPA"). Proceeding *pro se*, Chelmowski brought this case contesting the EPA's response to two "FOIA-on-FOIA" requests seeking records related to the EPA's processing of some of his many previous FOIA requests to the agency. The parties have cross-moved for summary judgment, *see* Dkts. 48, 54, and Chelmowski has also moved for *in camera* review of the disputed records and for discovery, *see* Dkt. 51. For the reasons that follow, the Court will **GRANT** in part and **DENY** in part the EPA's motion for summary judgment, Dkt. 48, will **DENY** Chelmowski's cross-motion for summary judgment, Dkt. 54, and will **DENY** his motion for *in camera* review and discovery, Dkt. 51.

**I. BACKGROUND**

The origins of Chelmowski's quarrel with the EPA are obscure, but they appear to relate to AT&T's alleged failure properly to transfer his cell phone number to another cell carrier. *See* Dkt. 24 at 1 (*Chelmowski v. EPA*, No. 23-cv-14725 (N.D. Ill. Apr. 23, 2024) (citing *Chelmowski*

*v. AT&T Mobility, LLC*, 615 F. App'x 380 (7th Cir. 2015))).  When his claim against AT&T

failed, Chelmowski expanded the dispute to include the Federal Communications Commission,

the National Archives, and the EPA, which has resulted in numerous cycles of FOIA requests,

litigation, and renewed FOIA requests concerning previous rounds of the conflict.  *Id.*  All told,

Chelmowski "has consumed a huge amount of Government and judicial resources on this ill-

conceived quest."  *Chelmowski v. United States*, No. 17-cv-1394, Order at 1, Dkt. 105 (D.D.C.

Aug. 25, 2021).  The saga, however, continues.

Chelmowski submitted the two FOIA requests at issue on October 11, 2018, and June 22,

2020, Dkt. 1 at 45, 62, seeking records of two EPA employees' communications related to

himself and his previous FOIA activity.  The first request ("2018 Request") sought a "[c]opy of

all EPA's Jennifer Hammitt's internal and external communications including but not limited to

emails, attachments, letters, memos, phone conversation notes and meeting notes for records

related to this FOIA/Privacy Act requester and his name 'Chelmowski' from January 1, 2015[,]

to October 11, 2018."  *Id.* at 45.  The second request ("2020 Request") sought "all Tim

Crawford's communications related to [Chelmowski], EPA[-]used derivatives of his name and

all EPA identifiers including all his privacy act requests . . . from April 2016 to later of this

FOIA and Privacy Act Request or the date of the FOIA and Privacy Act Search."[1]  *Id.* at 62.

The EPA responded to both requests by searching for "Chelmowski" in the email

accounts of the two identified EPA employees.  Dkt. 48-3 at 3–4 (Clark Decl. ¶ 6); Dkt. 48-5 at 4

(Jablonski Decl. ¶ 7).  The search of Hammitt's email located 149 potentially responsive records,

---

[1] At times, Chelmowski's filings in this case also object to the EPA's processing of some of his
other FOIA requests.  *See, e.g.*, Dkt. 51-1 at 30–34 (discussing requests made on November 4,
2024, and May 28, 2025); Dkt. 65 at 23 (same).  But those requests are not included in Plaintiff's
complaint, *see* Dkt. 1 at 1–43 (Compl.), and are not properly before the Court.

of which the EPA determined 29 were responsive and released 16 records in full, 10 in part, and withheld three in their entirety under FOIA Exemptions 5 and 6.  Dkt. 48-3 at 4–5 (Clark Decl. ¶¶ 7–13).  Chelmowski filed an administrative appeal, which the agency denied.  *Id.* at 5 (Clark Decl. ¶¶ 11–12); *see also* Dkt. 1 at 51–60.

The search of Crawford's email identified 315 potentially responsive records, which were ultimately narrowed to 39 responsive records, of which the EPA initially released 30 in full and eight in part under FOIA Exemptions 5 and 6.[2]  Dkt. 48-5 at 4–5 (Jablonski Decl. ¶¶ 8–12). Chelmowski filed an administrative appeal, which the EPA granted in part by rescinding the redactions in the partially withheld documents which had originally withheld Chelmowski's own personal information.  *Id.* at 5–6 (Jablonski Decl. ¶ 15).  The EPA also determined that two of those eight partially redacted documents were duplicative, which reduced the total number of unique responsive documents to 36.  *Id.*  After this case was filed, the EPA identified three further responsive records and released them in full, bringing the final total to 39 documents.  *Id.* at 6 (Jablonski Decl. ¶ 16).  Following its supplemental search and the resolution of Plaintiff's administrative appeal, the agency is no longer withholding or redacting any records responsive to the 2020 Request.  *Id.* (Jablonski Decl. ¶ 17).

Plaintiff then filed this suit in the United States District Court for the Northern District of Illinois in October 2023.  *See* Dkt. 1 at 1 (Compl.).  His complaint is difficult to parse, but it appears to allege, among other things, that the EPA failed to account for many of the documents responsive to his request, *id.* at 5–7 (Compl. ¶¶ 6–15), and that the agency's inconsistent redactions of records that were produced as responsive to more than one of his past FOIA

---

[2] The EPA determined that one of the responsive records, which was originally designated as withheld in full, had actually been produced as part of another production.  Dkt. 48-5 at 5 (Jablonski Decl. ¶ 14).

requests called some of the EPA's redactions and withholdings into question, *id.* at 26–30 (Compl. ¶¶ 67–74). He challenges the EPA's responses to both requests, *id.* at 40–41 (Compl.), and asks the Court to order the EPA to provide him with all non-exempt responsive records and award attorney's fees and costs, *id.* at 42–43 (Compl.).[3]

The EPA filed a motion to dismiss Plaintiff's claims concerning records that had already been litigated in separate FOIA litigation under the doctrine of *res judicata*, and to transfer the remaining claims to the United States District Court for the District of Columbia under the "first-filed rule" because Plaintiff had a pending case already underway in this Court concerning similar FOIA requests. Dkt. 12 at 5–8. Judge Seeger granted the motion to transfer without resolving the partial motion to dismiss. *See* Dkt. 24 (*Chelmowski v. EPA*, No. 23-cv-14725 (N.D. Ill. Apr. 23, 2024)). After the case reached this Court, it was assigned as related to the identically captioned *Chelmowski v. EPA*, No. 22-cv-3177. Dkt. 39; *see* Min. Order (June 28, 2024).

After the EPA answered the complaint, *see* Dkt. 33, it moved for summary judgment on all claims, *see* Dkt. 48. The Court directed Plaintiff to respond, *see* Dkt. 49, and he filed a motion for *in camera* review and discovery, *see* Dkt. 51 and, eventually, a cross-motion for summary judgment, *see* Dkt. 54. After an array of extensions, all three motions are now fully briefed and ripe for decision.

---

[3] In places, Plaintiff's filings (and original FOIA requests) refer to claims under the Privacy Act, 5 U.S.C. § 552a, in addition to FOIA. His complaint, however, raises no claim under the Privacy Act—and, indeed, expressly declines to invoke the Privacy Act. Dkt. 1 at 4 (Compl. ¶ 2). In its responses to Plaintiff's administrative appeals, moreover, the EPA asserted that his requests were improper under the Privacy Act because, among other things, they did not comply with the agency's regulatory requirements. Dkt. 1 at 57, 74. Plaintiff has not contested that determination before this Court.

## II.  LEGAL STANDARD

The Freedom of Information Act is premised on the notion that an "informed citizenry" is "vital to the functioning of a democratic society" and "needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  The Act embodies a "general philosophy of full agency disclosure." *U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 494 (1994) (citation modified).  It thus mandates that an agency conduct an adequate search for records and disclose those records, unless they fall within one of nine exemptions. *See DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015); 5 U.S.C. § 552(b)(1)–(9).

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56. *See, e.g.*, *Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011).  To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In a FOIA action, the agency may meet its burden by submitting "relatively detailed and non-conclusory" affidavits or declarations, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation modified), and an index of the information withheld, which is commonly known as a "*Vaughn* index," *see Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973).  A court may grant summary judgment to the agency based solely on these submissions when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation modified).  An agency's affidavits or

declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs.*, 926 F.2d at 1200 (citation modified). The Court reviews the agency's decision *de novo*, and the agency bears the burden of sustaining its action. 5 U.S.C. § 552(a)(4)(B).

In applying these standards, moreover, courts must be mindful that *pro se* filings are "to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation modified).

### III. ANALYSIS

#### A.      Adequacy of the Search

The Court starts with the adequacy of the EPA's searches. "An agency has an obligation under FOIA to conduct an adequate search for responsive records." *Ewell v. U.S. Dep't of Just.*, 153 F. Supp. 3d 294, 301 (D.D.C. 2016). The adequacy of an agency's search "is judged by a standard of reasonableness," *Weisberg v. U.S. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984), and "[a]n agency fulfills its obligations . . . if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents," *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (citation modified). "In order to obtain summary judgment[,] the agency must show that it made a good[-]faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

The agency can show that it conducted an adequate search by relying on "[a] reasonably detailed affidavit [or declaration], setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id.* Once the agency has proffered "relatively detailed and nonconclusory"

declarations describing its search, the burden shifts to the FOIA requester to "produce countervailing evidence" sufficient to establish a genuine dispute of material fact as to the adequacy of the search. *Morley v. CIA*, 508 F.3d 1108, 1116 (D.C. Cir. 2007) (citation modified). Such evidence might include, for example, "problems with . . . the specific search terms used or the inadequacy of the particular locations searched." *Heartland All. for Hum. Needs & Hum. Rts. v. U.S. Immigr. & Customs Enf't*, 406 F. Supp. 3d 90, 117 (D.D.C. 2019).

### 1.      *2018 Request*

In response to the 2018 request, which sought "Jennifer Hammitt's internal and external communications including but not limited to emails, attachments, letters, memos, phone conversation notes and meeting notes," that were "related to [Chelmowski] from January 1, 2015[,] to October 11, 2018," Dkt. 1 at 45, the EPA identified Hammitt "as the sole, potential records custodian for the search" and used the search term "Chelmowski" to search her Microsoft Outlook email account for the relevant time period, Dkt. 48-3 at 3–4 (Clark Decl. ¶ 6). Plaintiff offers several objections to the adequacy of this search. The Court agrees in part and disagrees in part.

First, Plaintiff objects that the EPA limited its search to Hammitt's Microsoft Outlook email account, rather than also including a search for records of other communications (such as phone conversations). Dkt. 54-1 at 2 (Pl.'s Resp. to Def.'s SUMF ¶ 1). In response, the EPA offers the Declaration of Jennifer Clark, who serves as the Associate General Counsel within the General Law Office in the EPA's Office of General Counsel. Dkt. 48-3 at 2 (Clark Decl. ¶ 2). According to Clark, Jennifer Hammitt is a former employee of the EPA's Office of General Counsel. *Id.* at 4 (Clark Decl. ¶ 6(c)). Clark explains that, after receiving Plaintiff's 2018 Request, a lawyer from the EPA's Office of General Counsel requested that the EPA's "eDiscovery Services . . . conduct a centralized search of Microsoft Outlook records" for the

7

relevant "time period, search term and potential records custodian." *Id.* at 3 (Clark Decl. ¶ 6). The agency further determined that Hammitt was "the sole, potential records custodian for the search because the request specifically asked for her communications." *Id.* at 4 (Clark Decl. ¶ 6(c)). Finally, Clark avers that "the [EPA] reasonably concluded" that the communications at issue "would be found in Ms. Hammitt's Microsoft Outlook email account." *Id.*

An agency need not search every location where responsive records might conceivably be located but, instead, must conduct a search "reasonably calculated to uncover all relevant documents." *Valencia-Lucena*, 180 F.3d at 325 (citation modified). In other words, "the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*." *Weisberg*, 745 F.2d at 1485 (emphasis in original). Here, however, the Court is unpersuaded that Clark's conclusory assertion that the agency "reasonably concluded" that the responsive records would be found in Hammitt's email account suffices to carry the EPA's burden. The Court does not doubt that the agency "reasonably" concluded that responsive records would likely be found in Hammitt's email account. But that does not mean that a search of her email account was "reasonably calculated to uncover" all—or even most—of the records that Plaintiff sought, *see Valencia-Lucena*, 180 F.3d at 325 (citation modified), and neither Clark nor any other EPA witness explains why the agency ruled out other potential repositories. To take just one example, the Court notes that many FOIA processing platforms contain various fields that permit agency employees to communicate regarding a pending FOIA request, *see*, *e.g.*, *Shapiro v. U.S. Dep't of Just.*, 507 F. Supp. 3d 283, 317 (D.D.C. 2020), yet the EPA says nothing about whether it maintains any electronic search records, including "communications," that might contain responsive material.

The Court expresses no view about whether any additional repositories of potentially responsive records exist in this case.  For present purposes, it is sufficient to note that Clark's (correct) observation that responsive records would likely be found in Hammitt's Microsoft Outlook email account fails to address whether additional records would likely be found in other places.  Absent evidence that the agency engaged in a search "reasonably calculated to uncover *all* relevant documents," *Valencia-Lucena*, 180 F.3d at 325 (emphasis added and citation modified), the Court cannot grant summary judgment in the EPA's favor on the adequacy of the search.

Plaintiff's second argument fares less well.  He argues that the EPA should have used additional search terms, such as misspellings of his name, beyond "Chelmowski."  Dkt. 54-1 at 2–3 (Pl.'s Resp. to Def.'s SUMF ¶ 1).  Plaintiff emphasizes that one email received by Hammitt includes an attachment that misspells his name as "Chelmoski," and he suggests that the EPA's limited search term might have missed otherwise-responsive records.  *Id.* at 3.  The 2018 Request, however, did not request records including variations on Chelmowski's name and, instead, requested a search for records related to "this FOIA/Privacy Act requester *and his name 'Chelmowski.'*"  Dkt. 1 at 45 (emphasis added).  It was not unreasonable for the EPA to conduct a search using the specific search term that Plaintiff emphasized, in quotation marks, in his own request.  Nor, of course, was it unreasonable for the agency to respond to a FOIA request for records related to a specific individual by conducting a search for records that include that person's name.  *See Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015) ("Where the search terms are reasonably calculated to lead to responsive documents, a court should neither micromanage nor second guess the agency's search." (citation modified)).  Finally, the record offers no reason to believe that the one misspelling that Plaintiff identified

somehow became embedded in the EPA's records or communications in a manner that the agency should have recognized and accounted for in its searches.

Plaintiff finally argues that the EPA misrepresented the number of responsive records it located. That concern, however, stems from Plaintiff's misunderstanding of the nature of the EPA FOIA-processing system. He first argues that the EPA should be required to produce the full set of 149 responsive records that were flagged at the first stage of the agency's search, maintaining that the EPA is "illegally withholding" many of those documents. Dkt. 51-1 at 11; Dkt. 54-1 at 3–4 (Pl.'s Resp. to Def.'s SUMF ¶ 2). As the agency has explained, however, those 149 records included the full set of "*potentially* responsive emails and attachments," which were reduced to 29 records after the EPA "removed *duplicate* emails" and otherwise omitted records that were not in fact responsive to the request.[4] Dkt. 48-3 at 4 (Clark Decl. ¶¶ 7, 9) (emphasis added). Plaintiff repeatedly asserts that the EPA has concealed these additional documents as part of a scheme of "extrinsic and intrinsic fraud," *see, e.g.*, Dkt. 51-1 at 11, but he does not identify any evidence that might overcome the presumption of good faith afforded to an agency's supporting declarations in this FOIA case.

In Plaintiff's final reply, he claims that the records he recently obtained in response to some of his other FOIA requests show that the EPA actually located 4,279 documents that were responsive to the 2018 request—far more than it acknowledged. Dkt. 65 at 16–17. The Court directed the EPA to file a sur-reply addressing the discrepancy, Min. Order (Feb. 4, 2026), and

---

[4] In his complaint, Plaintiff similarly objected that the Bates stamps of the records produced by the EPA demonstrated that many documents were missing. Dkt. 1 at 10–11 (Compl. ¶¶ 26–29). The Court has already explained to Plaintiff in other litigation, however, that the EPA "software applies Bates stamps before the documents are reviewed for responsiveness or deduplicated" and, therefore "this misalignment is a feature of the EPA's FOIA[-]processing system—not evidence of fraud or any sort of misconduct." *Chelmowski v. EPA*, No. 22-cv-3177, Mem. Op. and Order at 13–14, Dkt. 37 (D.D.C. Mar. 31, 2025).

the agency explained that the figure of 4,279 documents quoted by Plaintiff refers to the "Initial Load" of records "compiled during a preparatory stage of processing" that includes "non-searchable data . . . such as images or files that lack optical character recognition which require further processing to apply search terms and date range criteria." Dkt. 67 at 2–3. Such "[n]on-searchable data are routinely encountered in eDiscovery collections," Dkt. 67-1 at 3 (Thompson Decl. ¶ 6), and necessarily "include[] items that did not actually include 'hits' using date range and search term criteria derived from [Plaintiff's] FOIA request," *id.* (Thompson Decl. ¶ 9). Those records were then narrowed down, following further review, to the 149 potentially responsive records that the Court discussed above. *Id.* at 4 (Thompson Decl. ¶ 11). The record thus does not offer any support for Plaintiff's suggestion that the EPA has illicitly withheld thousands of records responsive to his FOIA request.

The Court will therefore grant in part and deny in part summary judgment to the EPA as to the adequacy of its search in response to the 2018 Request.

2.      *2020 Request*

In response to the 2020 Request, which sought "all Tim Crawford's communications related to . . . James Chelmowski, EPA[-]used derivatives of his name[,] and all EPA identifiers including all his privacy act requests . . . from April 2016 to . . . the date of the [search]," Dkt. 1 at 62, the EPA conducted a functionally identical search, using the sole search term "Chelmowski" to search Crawford's email account, Dkt. 48-5 at 4 (Jablonski Decl. ¶ 7). Plaintiff offers similar criticisms of this search and, although at times presenting a closer question than the 2018 Request, the Court again concludes that, with one exception, the EPA has carried its burden.

To start, the Court concludes that, as with Plaintiff's 2018 Request, the EPA has yet to offer an adequate explanation for why it only searched Crawford's Microsoft Outlook email

11

account.  Like Hammitt, Crawford is a former employee of the agency.  Dkt. 48-5 at 4 (Jablonski Decl. ¶ 7(c)).  And as with Hammitt, the agency offers evidence that responsive records were likely to be found in his email account.  *Id.*  Once again, however, it fails to offer evidence addressing whether other records are likely to be found in other repositories.  Without that evidence, the Court must reach the same conclusion with respect to Plaintiff's 2020 Request that it has reached with respect to his 2018 Request:  The EPA has yet to carry its burden of demonstrating that it conducted a search "reasonably calculated to uncover all relevant documents."  *Valencia-Lucena*, 180 F.3d at 325 (citation modified).

In addition to this omission, Plaintiff appears to argue that the EPA should have used "his assigned FOIA and Privacy Act control numbers" as search terms in addition to his name.  Dkt. 54-1 at 8 (Pl.'s Resp. to Def.'s SUMF ¶ 9).  It is true that, unlike the 2018 Request, the 2020 Request referred to "communications related to . . . all EPA identifiers" of Chelmowski, which might be interpreted as including any FOIA or Privacy Act numbers used to reference him within the EPA system.  Dkt. 1 at 62.  As a general rule, however, "a FOIA petitioner cannot dictate the search terms for his or her FOIA request," *Bigwood*, 132 F. Supp. 3d at 140, and the final selection of terms is left to the agency's discretion.  It was not unreasonable for the EPA to conclude, as it did, that a search for records including Chelmowski's name was reasonably calculated to locate "all Tim Crawford's communications related to this FOIA and Privacy Act requester James Chelmowski, EPA[-]used derivatives of his name and all EPA identifiers including all his privacy act requests."  Dkt. 48-5 at 3 (Jablonski Decl. ¶ 5).  Fairly construed, this request sought Crawford's communications relating to Plaintiffs' FOIA and Privacy Act requests, and the agency reasonably concluded that any such communication would mention Chelmowski by name.

12

Plaintiff also objects, again, that the EPA should have conducted additional searches using misspellings of his last name.  Dkt. 54-1 at 9 (Pl.'s Resp. to Def.'s SUMF ¶ 9).  This argument carries more force when applied to the 2020 Request, which sought records related to any "EPA[-]used derivatives" of Plaintiff's name.  Dkt. 1 at 62.  The Court, however, is nonetheless persuaded that the EPA's search was reasonably calculated to uncover responsive materials.  A misspelling is not literally a "derivative" of Plaintiff's name—as opposed to if the EPA, hypothetically, sometimes affixed a "Chel" label or the like to materials concerning Plaintiff's requests—and the Court declines to "second guess" the agency's decision where, as here, its choice of terms was "reasonable."  *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 146–47 (D.D.C. 2015).  There is no reason to believe that the EPA anonymized or otherwise re-labeled Chelmowski's FOIA and Privacy Act requests in a manner that renders a search for "Chelmowski" underinclusive.

The Court will therefore grant in part and deny in part summary judgment to the EPA as to the adequacy of this search as well.

**B.    Exemptions**

The question of the propriety of the EPA's redactions and withholdings is only relevant to the 2018 Request, because the agency is no longer withholding any records responsive to the 2020 Request.  Dkt. 48-5 at 6 (Jablonski Decl. ¶ 17).  As for the 2018 Request, the EPA withheld nine documents in part or in full under FOIA Exemption 5 pursuant to the deliberative process privilege, nine documents in part or in full under FOIA Exemption 5 pursuant to the attorney-client privilege, and three documents in part under FOIA Exemption 6.  Dkt. 48-3 at 5–8 (Clark Decl. ¶¶ 15, 17, 19); *see also* Dkt. 48-4 (*Vaughn* Index).

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C.

13

§ 552(b)(5).  This exemption shields "those documents . . . normally privileged in the civil discovery context."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Courts have, accordingly, incorporated the three traditional civil discovery privileges under Exemption 5: "(1) the attorney work-product privilege; (2) the deliberative process privilege; and (3) the attorney-client privilege."  *Wright v. U.S. Dep't of Just.*, 121 F. Supp. 3d 171, 184 (D.D.C. 2015).

"Exemption 6 provides that the disclosure requirements of the FOIA do not apply to 'personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.'"  *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 596 n.1 (1982) (quoting 5 U.S.C. § 552(b)(6)).  The purpose of Exemption 6 is "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."  *Multi Ag Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008) (emphasis omitted) (quoting *Wash. Post Co.*, 456 U.S. at 599).  The exemption is properly invoked where the privacy interests outweigh any public interest in the information.  *Insider Inc. v. Gen. Servs. Admin.*, 92 F.4th 1131, 1135 (D.C. Cir. 2024).

The EPA's detailed *Vaughn* index, Dkt. 48-4, along with the Clark Declaration, Dkt. 48-3 (Clark Decl.), adequately explain the basis for the agency's invocation of the relevant FOIA Exemptions.  For example, under the deliberative process privilege, the EPA withheld discussions between its Office of General Counsel management and staff attorneys concerning Chelmowski's FOIA and Privacy Act requests.  As the agency explains, "the[] communications were exchanged as part of the decision-making process and represent opinions and judgments that were under consideration by OGC," and their "[r]elease would have a chilling effect on the Agency's ability to have open and frank discussions among its staff on how to respond to FOIA requests and appeals."  Dkt. 48-4 at 3.  Similarly, the EPA withheld communications between

EPA staff attorneys and managers where the participants "were seeking legal advice regarding how to respond to litigation pending against the [EPA]," and the responsive record "contain[ed] the opinions of attorneys and represent[ed] the legal questions raised by the pending litigation and EPA's proposed responses." *Id.* at 5.

Based on those explanations, the Court concludes that the EPA has shown that it properly invoked Exemption 5's deliberative process privilege, which applies to records that are "predecisional"—meaning "they are generated before the adoption of an agency policy"—and "deliberative"—meaning they "reflect the give-and-take of the consultative process." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (citation modified). The EPA's "analysis and recommendations on policies still in development," Dkt. 48-4 at 14, falls within the heartland of the privilege. The same is true for the EPA's reliance on Exemption 5's attorney-client privilege, which "'protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services,' as well as 'communications from attorneys to their clients if the communications rest on confidential information obtained from the client.'" *Pub. Citizen, Inc. v. U.S. Dep't of Educ.*, 388 F. Supp. 3d. 29, 40 (D.D.C. 2019) (quoting *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997)). Typically, "[i]n the FOIA context, the agency is the 'client' and the agency's lawyers are the 'attorneys' for the purposes of attorney-client privilege." *Jud. Watch, Inc. v. U.S. Dep't of Treasury*, 802 F. Supp. 2d 185, 200 (D.D.C. 2011). Communications "seeking legal advice regarding how to respond to a subpoena," Dkt. 48-4 at 12, to take one example, easily qualify.

As for Exemption 6, the EPA withheld "a private citizen's Naturalization Certificate Number and Social Security Number, the public disclosure of which would constitute a clearly unwarranted invasion of personal privacy," *id.* at 8, as well as a record that "includes the family-

15

related leave issue of an EPA employee," *id.* at 3. The Court agrees with the EPA that "[t]here is no public interest" in such information, and that, accordingly, the resulting harm to individual privacy "clearly outweighs the public interest in such disclosure." *See, e.g.*, *id.* at 11.

Plaintiff's objections to the agency's invocation of the applicable FOIA Exemptions are difficult to parse. Beyond repeating his general, unsupported allegations of fraud and perjury, he appears to argue that the EPA cannot rely on the attorney-client privilege under Exemption 5 for records that include communications involving both EPA and FCC attorneys because the agency has not shown that the EPA acted as attorney for the FCC, or vice-versa. *See, e.g.*, Dkt. 51-1 at 16. As the EPA explains, however, this argument "misunderstands the scope of Exemption 5," Dkt. 57 at 7, which protects communications between agencies and their attorneys for the purpose of legal advice rather than being limited to situations where one agency is acting as an attorney for another.

Plaintiff also objects that the EPA redacted materials in response to the 2018 Request that were then released in full pursuant to some of his other, later FOIA requests. *See* Dkt. 51-1 at 17–20; Dkt. 65 at 6–7. As to the specific records that Plaintiff highlights as having been released in full, any challenge to the EPA's prior withholdings of those records is, of course, now moot. And the Court disagrees with Plaintiff's suggestion that the EPA's decision to release these previously withheld records calls the agency's good faith into question or otherwise overcomes the facial sufficiency of the Clark Declaration or the EPA's *Vaughn* index in this case. *See Pub. Citizen v. U.S. Dep't of State*, 276 F.3d 634, 645 (D.C. Cir. 2002) ("[W]e have previously declined to find subsequent disclosure as evidence of bad faith, reasoning that to effectively penalize an agency for voluntarily declassifying documents would work mischief by creating an incentive against disclosure." (citation modified)).

16

To take one example, Plaintiff objects to the EPA's initial redaction of an email asking for advice on how to meet a deadline to respond to a subpoena. Dkt. 65 at 6–7. For present purposes, the Court need not decide whether the initially redacted material was protected under the attorney-client privilege and was therefore covered by FOIA Exemption 5. Instead, it is sufficient to observe that the issue is subject to fair debate and, more importantly, that an initial decision (later retracted) to redact an email raising a legal question in a communication with other government employees does not call the EPA's good faith into question. And, as relevant here, it certainly does not suggest that the withholdings, which the EPA explains in detail in the *Vaughn* index, are improper or are premised on misrepresentations. The "presumption of good faith," *see Mobley v. CIA*, 806 F.3d 568, 582 (D.C. Cir. 2015), is not so easily defeated.

Finally, beyond demonstrating that its redactions and withholdings fall under a FOIA Exemption, the EPA also "bears the burden of showing that it 'reasonably foresees that disclosure would harm an interest protected by an exemption.'" *Leopold v. U.S. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)). The agency has done so. Clark attests that releasing the materials covered by the deliberative process privilege "would have a chilling effect on the EPA staff's ability to have open and frank discussions concerning how to best process Plaintiff's numerous FOIA requests and other FOIA requests and how to effectively draft written responses to Plaintiff;" that the release of the attorney-client privileged materials "would deprive [EPA staff] of the benefit of confidential legal advice from EPA attorneys in legal matters related to the [EPA's] responses under the FOIA and the Privacy Act" and "would have a chilling effect on the EPA staff's ability to have open and frank discussions with [EPA] and/or DOJ attorneys concerning legal issues;" and that release of the materials covered by Exemption 6 would create a "harm to the individuals as a result of the disclosure

17

[that] clearly outweighs the public interest in such disclosure." Dkt. 48-3 at 6–8 (Clark Decl. ¶¶ 15, 17, 20–21).

The Court will therefore grant summary judgment to the EPA as to its withholdings under FOIA Exemptions 5 and 6.

## C.    Segregability

Having withheld portions of the responsive records pursuant to FOIA Exemptions 5 and 6, the EPA also bears the burden of showing that it produced all "reasonably segregable portion[s] of a record." 5 U.S.C. § 552(b). To do so, the agency must demonstrate "with reasonable specificity" that the information it withheld cannot be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996) (citation modified). The EPA's statements as to segregability are, as is not unusual in FOIA cases, far from detailed. Clark attests that the EPA reviewed the withheld information "to ensure that all reasonably segregable, non-exempt, factual information has been released to Plaintiff" and "determined that the factual information contained within the withheld portions of documents was inextricably intertwined with the [withheld] information and could not be reasonably segregated . . . without causing foreseeable harm." Dkt. 48-3 at 6 (Clark Decl. ¶ 16), *see also id.* at 7–8 (Clark Decl. ¶¶ 18, 22). The comparatively detailed *Vaughn* index, however, places the agency's representations in context and allows the Court to discern what the agency has withheld and what it has not. Considering all of this together, the Court is persuaded that the agency's submissions suffice to carry its burden—with one minor exception.

In his final reply, Plaintiff notes that some of the records produced in response to the 2018 Request do not include his name in any of the non-redacted portions of the materials. Dkt. 65 at 42–44. He reasons, logically, that because the EPA located these records following a search for Chelmowski's name, and his name does not appear elsewhere, it must be contained

somewhere in the redacted portion of the emails. *Id.* It is possible that Plaintiff's name is so enmeshed with the exempt portions of the records that the EPA is unable to further segregate and release any further information, or, more likely, that the agency determined that disclosing his name in the middle of a sentence would fail to convey any meaningful information. But because the EPA's submissions say nothing about this question, and because the agency's omission might signal a larger problem, the Court will direct the EPA to reexamine its segregability determinations and either submit a further declaration explaining its choices or disclose the portions of the records that contain "Chelmowski," along with any adjacent (or other) non-exempt material.

*   *   *

For those reasons, the Court will grant in part and deny in part the EPA's motion for summary judgment as to the segregability of the records. Despite those remaining outstanding issues, the Court will also deny Plaintiff's motion for summary judgment in its entirety, without prejudice. Although the Court has cautioned the government that second chances in FOIA litigation are not guaranteed, *see Shteynlyuger v. Ctrs. for Medicare & Medicaid Servs.*, 698 F. Supp. 3d 82, 133 (D.D.C. 2023), the Court concludes that, here, the agency's remaining tasks are modest and that they do not reflect a lack of attention or an unduly casual approach to the agency's obligations under FOIA.

**D.      *In Camera* Review and Discovery**

The final issue before the Court is Plaintiff's motion seeking either *in camera* review of the disputed records or limited discovery into the circumstances of the EPA's searches. *See* Dkt. 51. Although "FOIA provides district courts the option to conduct *in camera* review . . . it by no means compels the exercise of that option." *Juarez v. U.S. Dep't of Just.*, 518 F.3d 54, 59–60 (D.C. Cir. 2008); *see also* 5 U.S.C. § 552(a)(4)(B). The D.C. Circuit has advised that "*in camera*

19

inspection of [records] is unnecessary" where "[the] agency's affidavits sufficiently describe the documents and set forth proper reasons for invoking an exemption," *Juarez*, 518 F.3d at 60, and has further cautioned that such review is not "appropriate" if "the agency meets its burden under [FOIA] by means of affidavits," *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 23 (D.C. Cir. 1984) (citation modified).  Similarly, ordering discovery "is rarely appropriate in FOIA cases," *Pavement Coatings Tech. Council v. U.S. Geological Surv.*, 995 F.3d 1014, 1024 (D.C. Cir. 2021), and typically requires evidence of agency bad faith, *see In re Clinton*, 973 F.3d 106, 113 (D.C. Cir. 2020).

Plaintiff has not demonstrated that either *in camera* review or further discovery is warranted on the present record.  As explained above, the Court is persuaded, with only minor exceptions, that the EPA's supporting declarations and *Vaughn* index adequately explained the agency's search and withholdings.  Beyond his unsupported allegations that the EPA has engaged in a vast fraudulent conspiracy against him, Plaintiff does not offer any basis to question the propriety of the EPA's conduct or to undertake the unusual steps of *in camera* review or permitting additional discovery.

The Court will therefore deny Plaintiff's motion for *in camera* review and discovery.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, Dkt. 48, is hereby

**GRANTED** in part and **DENIED** in part.  Plaintiff's motion for *in camera* review and

discovery, Dkt. 51, and cross-motion for summary judgment, Dkt. 54, are hereby **DENIED**.

       **SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 27, 2026